# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

  v.

DOUGLAS E. BROWN, HANS H.
KUHLEN, WELLSHIRE
SECURITIES (DEUTSCHLAND)
GMBH, WELLSHIRE SECURITIES,
INC., WELLSHIRE SECURITIES
BAHAMAS, LTD., WELLSHIRE
SERVICES, INC., and BENETIX,
A.G.,

      Defendants-Appellees,

STEVEN W. CALL,

      Receiver-Appellee,

GROUP 2 CLAIMANTS,

      Appellees.

No. 01-4229
( D.C. No. 2:95-CR-245-B)
(D. Utah)

## ORDER
### Filed November 4, 2003

Before **MURPHY** , **McWILLIAMS** , and **HARTZ** , Circuit Judges.

This matter is before the court on Appellees' petition for rehearing en banc.

The members of the hearing panel have determined that it is appropriate to revise

section III(A)(2)(b)(ii) of the opinion. The panel therefore GRANTS rehearing IN PART, WITHDRAWS the opinion filed on July 8, 2003, VACATES the judgment, and substitutes the modified opinion attached to this order.

The petition for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the petition is denied.

Entered for the Court
PATRICK FISHER, Clerk of Court


By:
  Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

NOV 4 2003

PATRICK FISHER
Clerk

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

DOUGLAS E. BROWN, HANS H. KUHLEN, WELLSHIRE SECURITIES (DEUTSCHLAND) GMBH, WELLSHIRE SECURITIES, INC., WELLSHIRE SECURITIES BAHAMAS, LTD., WELLSHIRE SERVICES, INC., and BENETIX, A.G.,

Defendants-Appellees,

STEVEN W. CALL,

Receiver-Appellee,

GROUP 2 CLAIMANTS,

Appellees.

No. 01-4229

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:95-CR-245-B)**

---

Joel McElvain, Attorney, Department of Justice, Washington, D.C. (Eileen J. O'Connor, Assistant Attorney General, Thomas J. Clark, Attorney, Department of Justice, Washington, D.C., with him on the briefs, Paul M. Warner, United States Attorney, Salt Lake City, Utah, of counsel), for Plaintiff-Appellant.

Steven W. Call (Herschel J. Saperstein, Bruce L. Olson, and Steven H. Gunn, with him on the brief), of Ray, Quinney & Nebeker, Salt Lake City, Utah, for Receiver-Appellee.

Matthew C. Barneck (Diana G. Matkin, with him on the brief), of Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for Appellees.

-----

Before **MURPHY** , Circuit Judge,  **McWILLIAMS** , Senior Circuit Judge   , and **HARTZ,**  Circuit Judge.

-----

**HARTZ** , Circuit Judge.

-----

A number of German citizens were defrauded when they attempted to invest in United States securities.  Assets were obtained from the perpetrators of the fraud to create a receivership estate to compensate the victims.  The United States has claimed that the estate is a Qualified Settlement Fund (QSF) that is liable for income taxes on its earnings.  The district court ruled that the fund did not satisfy the criteria to be a QSF, and the United States appealed.  We reverse.

## I.  BACKGROUND

Hans H. Kuhlen and Douglas E. Brown managed or controlled various businesses (the businesses) that were involved in a scheme to market securities to investors.  The businesses contracted with hundreds of German citizens for the purchase of securities in the United States.  An FBI investigation produced evidence that Brown, Kuhlen, and several of the businesses had wrongfully

represented that the securities they offered were (1) regulated and insured by the National Association of Securities Dealers and the Securities Investor Protection Corporation, (2) freely transferable, and (3) traded on recognized exchanges. The FBI also found evidence that some of the businesses were dealing in securities without obtaining the appropriate broker/dealer registrations, were misleading their clients as to the history of one of the businesses, and were falsely representing one of the businesses as a "world-leading" investment bank.

The FBI obtained a search warrant for the premises of one of the businesses, Wellshire Services, Inc. (Wellshire), and seized a number of stock certificates. Wellshire then moved under Rule 41(e) of the Federal Rules of Criminal Procedure for return of some of the seized property, including stock certificates that belonged to German investors. The court initially allowed stock certificates to be released to Wellshire upon proof that its customers were entitled to possession. But the court halted release of the stock when it suspected that Wellshire had fabricated claims and did not own or control as many shares of stock as it had sold.

Brown, Kuhlen, and five of the businesses were later indicted for securities fraud and related offenses. The indictment sought forfeiture of "any and all property, real and personal, involved in the . . . offenses, and any and all property traceable to such property." Aplt. App. at 32. Both Brown and Wellshire entered

into stipulations with the United States whereby they released their claims to certain property and placed that property in a fund designed to provide restitution to the defrauded investors. Two other businesses entered into similar stipulations: Desert Mountain Properties, Inc. stipulated to the sale of a residence and its furnishings; and the D. E. Brown Family Trust relinquished its claims to the proceeds of a sale of stock seized by the United States. The proceeds of the sales were added to the restitutionary fund.

To make a claim on the fund, a Wellshire customer needed to complete a form that asked the customer to "[i]dentify each stock or security purchased, the number of shares purchased, [the] purchase price per share, [the] date of purchase, the amount . . . paid for the shares[,] and whether [the investor] . . . [had] received the shares purchased." *Id.* at 73. The form announced a deadline for submitting claims.

The United States asked that a receiver be appointed "[b]ecause of the complex nature of the interests involved" and the fact that "the interests of the [investors could] potentially conflict with respect to some assets." *Id.* at 78. The district court granted the United States' request, appointing Steven W. Call (the Receiver). At the same time, the court identified the receivership estate (the Estate) as "[a]ll property [then] held by the United States of America and/or its agencies or employees in connection with the . . . case, including but not limited

-4-

to the assets of Wellshire Securities and/or its principles [sic] or affiliated entities which were seized." *Id*. at 81. The court authorized the Receiver "to endorse, sell and/or transfer all of the securities in his possession for the benefit of the estate, and . . . to liquidate any securities belonging to the estate that are in the possession of other brokers." *Id*. at 94.

The Receiver proceeded to gather and liquidate the Estate's assets, which included not only cash, stocks, and real estate, but also art, wine, and furniture. Ultimately, the Receiver was successful in converting most of the Estate's assets to cash. At one point the Estate's value exceeded $10,000,000. Nevertheless, the Receiver reported that "the total assets held in the . . . [E]state are worth less than one-fourth of the total claims filed against the . . . [E]state." Rec. Br. at 23.

Although some claimants suggested that the Receiver distribute the seized stock certificates (or the proceeds of their sale) directly to the owners of each particular certificate, the Receiver rejected this suggestion as contrary to the court's earlier order directing him "to sell and not return stock." Aplt. App. at 108. Instead, the Receiver suggested that the claimants "share pro-ratably based upon the amount of their allowed claim." *Id*.

Almost two years after the Estate was established, the IRS submitted a proof of claim stating that the Estate owed taxes in the amount of $1,288,932.05 (plus interest). The original proof of claim identified the Estate as a Designated

Settlement Fund (DSF), but an amended version identified it as a Qualified Settlement Fund (QSF). The Receiver objected to the proof of claim on the ground that the Estate was not taxable as either a DSF or QSF.

The court then ordered appointment of a special master (the Master) to recommend a final resolution of all claims asserted against the Estate, including the tax claim. After briefing and argument the Master issued a report concluding that the Estate was not a QSF and recommending denial of the tax claim. The district court adopted the Master's report and recommendation.

The United States appeals. Appellees are the Receiver and the Group 2 Claimants (Claimants), a set of claimants for whom the district court appointed counsel. (The Group 1 Claimants, who had separate counsel, have settled and are not parties on appeal.)

## II.  JURISDICTION

In the order being appealed, the district court addressed the IRS's tax claim without addressing the individual claims of the investors. We entered a show-cause order directing the parties to file memoranda regarding the appealability of the district court's order, because only final orders are appealable as of right, and, in general, an order is not final unless it disposes of all remaining claims, *see Ashley Creek Phosphate Co. v. Chevron USA*, *Inc.*, 315 F.3d 1245, 1263 (10th Cir. 2003). In their memoranda the parties agreed that immediate appeal was

-6-

available under the collateral order doctrine. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). The jurisdictional issue was then referred to the merits panel. Before we heard oral argument, however, the parties asked the district court to certify its order as final and appealable under Federal Rule of Civil Procedure 54(b). The district court, by order dated May 17, 2002, issued the requested certification.

On appeal neither party questions our jurisdiction. Nor do we. If the district court's original order was not a final order under the collateral order doctrine, it became a final order when the district court properly certified it under Rule 54(b). After obtaining certification under Rule 54(b), a party need not file a second notice of appeal. "[W]e will deem the notice of appeal to ripen as of the date of certification and will accept jurisdiction pursuant to the savings provision of Fed. R. App. P. 4(a)(2)." *Lewis v. B. F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) (en banc). Our jurisdiction being secure, no further discussion is necessary.

## III. THE MERITS

The United States claims that the Estate is a taxable entity, subject to tax as a QSF on any income generated by assets in the Estate. Appellees, on the other hand, dispute that the Estate is a QSF, arguing, in essence, that the Estate's assets should be treated as if owned by the claimants to whom those assets will

ultimately be distributed. Because those claimants are German citizens, a treaty exempts them from United States taxes on capital gains and other investment income. Thus, the stakes are high.

Treasury Regulation § 1.468B-1, entitled "Qualified settlement funds," and accompanying regulations (§§ 1.468B-2, -3, and -4) constitute an effort to deal with the various tax questions that arise when an independent settlement fund is created to pay a debtor's liabilities. The proper approach to taxation of financial transactions involving such a fund is not immediately apparent. The transactions could be treated as if the assets still belonged to the person who contributed the assets to the fund or as if the assets belonged to those to whom the assets would ultimately be distributed, or the fund itself could be treated as a taxpayer that owns the assets. Other questions that may arise include: When can a debtor who contributes to the fund take a tax deduction for its contribution (assuming that the contribution is otherwise deductible)—when the payment is made into the fund, when a claimant receives payment, or at some other time? Or when does the claimant recognize income? *See generally* Ellen K. Harrison & Gary B. Wilcox, *Settlement Fund Final Regs. Answer Many Questions, But Problems Still Exist*, 78 J. Tax'n 342 (1993); Ellen K. Harrison, *IRS Fills Void on Tax Treatment of Settlement Funds With Generally Favorable Rules*, 76 J. Tax'n 358 (1992).

In this case, treatment of the Estate as a QSF appears to provide no benefit

to those who contributed to the Estate or those who will receive distributions from it; only the IRS stands to gain. But often treatment of a settlement fund as a QSF benefits a taxpayer. For example, one who contributes funds to a QSF may be able to take a deduction that would otherwise not be available until the funds are distributed to claimants. *See* § 1.468B-3(c). In the following discussion it will be helpful to keep in mind that the QSF regulations were designed to cover a host of circumstances, not just the specific, and rather unusual, circumstances presented here.

Section 1.468B-1(c) defines a QSF as follows:

> A fund, account, or trust satisfies the requirements of this paragraph (c) if—
>
> (1) It is established pursuant to an order of, or is approved by, the United States, any state (including the District of Columbia), territory, possession, or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;
>
> (2) It is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability. . . [a]rising out of a tort, breach of contract, or violation of law; . . . and
>
> (3) The fund, account, or trust is a trust under applicable state law, or its assets are otherwise segregated from other assets of the transferor (and related persons).

-9-

The United States contends that the Estate is a QSF within this definition because (1) the Estate was established by a court order; (2) the purpose of the Estate is to pay claims arising out of fraudulent transactions in violation of the securities laws; and (3) the Estate's assets are segregated from the assets of all other persons. Appellees bear the burden of establishing the error in the IRS's determination of the tax due. *See Dolese v. Comm'r*, 811 F.2d 543, 546 (10th Cir. 1987).

Appellees mount numerous attacks (some by both Appellees and some by only one) on the contention that the Estate should be treated as a QSF. First, they argue that the Estate does not satisfy the regulation's criteria for being a QSF. Although they concede that the Estate satisfies the requirements of subparagraph (3) of § 1.468B-1(c), they raise objections concerning the other subparagraphs. With respect to subparagraph (1), they claim that the court order was inadequate to establish a QSF because the order did not conform to a local court rule. And as for subparagraph (2), they argue that the Estate does not "resolve or satisfy" claims because it will not extinguish them, and that none of the liabilities at issue here is the type of liability (what we will call a "predicate liability") which a fund must "resolve or satisfy" for it to be a QSF. Appellees further assert that the Estate cannot be a QSF because it does not have a transferor, as implicitly required by the regulations, and that a proposed Treasury regulation indicates that

-10-

funds like the Estate are not meant to be treated as QSFs.

Next, Appellees challenge the validity of the regulations. They contend that the statute authorizing the QSF regulations is an unconstitutional delegation of legislative power, that the QSF regulations go beyond what is permitted by the authorizing statute, and that the regulations cannot be applied here because such application would violate a United States treaty with Germany. Finally, they argue that the Estate should be taxed as a liquidating grantor trust and that its capital gains should be offset by the investors' losses.

We now address each of the arguments. "We review the district court's interpretation of federal statutes and regulations *de novo* . . . ." *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1030 (10th Cir. 2003) (internal citation omitted). The pertinent facts are undisputed.

**A. Does the Estate Satisfy the QSF Criteria?**

**1. Subparagraph (1)**

A fund satisfies subparagraph (1) of § 1.468B-1(c) if "[i]t is established pursuant to an order of . . . a court of law . . . ." Appellees do not dispute that the Estate was established by an order of the district court. But Claimants contend that the order could not have created a QSF because it did not conform to District of Utah Local Rule 67-1(b)(3), which states:

> *Order of the Court.* A designated or qualified settlement
> fund will be established by the clerk only on order of the

-11-

court on motion and stipulation by all parties or on acceptance by the court of the terms of the settlement agreement. The court reserves the authority to designate its own outside fund administrator.

D. Utah Civ. R. 67-1(b)(3). They note that the Estate was not created as a QSF by stipulation or settlement of all parties, as the local rule appears to require.

Although we doubt that a local court rule could alter the requirements for a fund to be a QSF, we need not decide the matter. Rule 67-1(b)(3) is inapplicable here. It is merely a provision within Local Rule 67, which governs the deposit, receipt, and subsequent treatment of court registry funds, *see* D. Utah Civ. R. 67-1,[1] as does Fed. R. Civ. P. 67. The assets of the Estate, however, were not

---

[1]Local Rule 67-1 (a) & (b) state:

**RECEIPT AND DEPOSIT OF REGISTRY FUNDS**

**(a) Court Orders Pursuant to Fed. R. Civ. P. 67**. Any party seeking to make a Rule 67 deposit, with the exception of criminal cash bail, cost bonds, and civil garnishments, must make application to the court for an order to invest the funds in accordance with the following provisions of this rule.

**(b) Provisions for Designated or Qualified Settlement Funds**

(1) *By Motion.* Where the parties jointly seek to deposit funds into the court's registry to establish a designated or qualified settlement fund under 26 U.S.C. § 468B(d)(2), the parties must identify the deposit as such in a joint motion and stipulation for an order to deposit funds in the court's registry. Such motion also must recommend to the court an outside fund administrator who will be responsible for (i) obtaining the fund employer identification

(continued...)

-12-

deposited into the district court's registry, but were held by the United States.

## 2. Subparagraph (2)

The United States contends that the Estate satisfies subparagraph (2) of § 1.468B-1(c) because it was "established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability . . . [a]rising out of a tort, breach of contract, or violation of law." Treas. Reg. § 1.468B-1(c)(2). Appellees challenge that contention on two grounds. One ground, supported by alternative arguments, is that the Estate

---

[1](...continued)
> number, (ii) filing all fiduciary tax returns, (iii) paying all applicable taxes, and (iv) otherwise coordinating with the fund depository to ensure compliance with all IRS requirements for such funds.
>
> (2) *By Settlement Agreement.* Where the parties enter into a settlement agreement and jointly seek to deposit funds into the court's registry to establish a designated or qualified settlement fund under 26 U.S.C. § 468B(d)(2), the settlement agreement and proposed order must (i) identify the funds as such, and (ii) recommend to the court an outside fund administrator whose responsibilities are set forth in subsection (b)(1) of this rule.
>
> (3) *Order of the Court.* A designated or qualified settlement fund will be established by the clerk only on order of the court on motion and stipulation by all parties or on acceptance by the court of the terms of the settlement agreement. The court reserves the authority to designate its own outside fund administrator.

cannot be a QSF because it does not extinguish the claims—the Estate has far too little money to compensate the claimants fully and the claimants are not required to release anyone from liability. The alternative arguments are (1) that one cannot "resolve or satisfy" a claim without extinguishing it, and (2) that the liabilities at issue are "for the provision of services or property," and the regulations explicitly require that a fund extinguish those liabilities if it is to be considered a QSF. Their second ground is that the liabilities at issue here cannot be predicate liabilities for a QSF, because they do not "[a]ris[e] out of a tort, breach of contract, or [other] violation of law," and are of a type explicitly excluded by the regulation from being predicate liabilities. We now address their arguments.

### a. Failure to Extinguish Liabilities

#### (i) "Resolve or Satisfy"

Claimants assert that the Estate cannot "resolve or satisfy" claims unless the claims are extinguished, either by full payment or release. The United States concedes that a claim cannot be "satisfied" unless it is extinguished and that distributions from the Estate will neither fully pay the victims' claims nor result in releases from liability by the victims. It argues, however, that "resolve" in this context means only "to reach a decision about."

We take a different approach. Subparagraph (2) requires that a QSF be "established to resolve or satisfy one or more . . . claims." Treas. Reg. § 1.468B-

1(c)(2). In our view, the words "established to" are the key. When we say that a program has been "established to" do something, we do not necessarily mean that the program will fully accomplish that task, or even that we expect the task to be fully accomplished. We may be merely stating the aim, the direction, of the program. One could say that the War on Poverty was established to eradicate poverty or that the United Nations was established to end military conflict, even though partial success would be considered a victory. More closely in point, mediation programs, even settlement conferences, can be said to be "established to settle disputes"; yet no one expects all disputes to be settled, and partial resolution would be welcome.

Of course, an institution "established to" do something may invariably accomplish that task. Courts are established to resolve disputes; and, for better or worse, they do so. The point here is only that the phrase "established to resolve or satisfy. . . claims" is ambiguous. It may mean that all claims are to be resolved or satisfied; or it may mean only that the institution is directed toward that end, and partial resolution or satisfaction, or even failure, is a potential result. To determine the meaning of this ambiguous language, we look for clues elsewhere in the regulations. *See OXY USA, Inc. v. Babbitt*, 268 F.3d 1001, 1005 (10th Cir. 2001) (en banc) (court deciphers the meaning of a particular statutory provision by "considering the language and structure of the statute as a whole").

One compelling clue comes from the section of the regulations dealing with liabilities for the provision of services or property. The section's general rule is that such a liability cannot be the predicate liability for a QSF unless the fund extinguishes the liability, although there is a limited exception for liabilities under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The language is as follows:

> *Resolve or satisfy requirement*—(1) *Liabilities to provide services or property.* Except as otherwise provided in . . . [subsection (2) below], a liability is not described in paragraph (c)(2) of this section [the section describing the resolve-or-satisfy requirement generally] if it is a liability for the provision of services or property, unless the transferor's obligation to provide services or property is *extinguished* by a transfer or transfers to the fund, account, or trust.

> (2) *CERCLA liabilities.* A transferor's liability under CERCLA to provide services or property is described in paragraph (c)(2) of this section if following its transfer to a fund, account or trust the transferor's only remaining liability to the Environmental Protection Agency (if any) is a remote, future obligation to provide services or property.

Treas. Reg. § 1.468B-1(f) (emphasis added). That the drafters chose specifically to require extinguishment when the transferor has an obligation to provide services or property suggests that extinguishment is not generally required. Indeed, if we were to reach the opposite conclusion—that the phrase "resolve or satisfy" creates a complete-extinguishment requirement for all predicate

-16-

liabilities—the specific requirement would be rendered superfluous, a result to be avoided, *see OXY USA*, 268 F.3d at 1006 ("We must avoid, whenever possible, a statutory interpretation that would render superfluous other provisions in the same enactment." (internal quotation marks omitted)).

Claimants respond that because a fund does not need to extinguish completely a transferor's liability for the provision of services or property when that liability arises under CERCLA, the drafters found it necessary to reiterate (in the services-or-property provision) that complete extinguishment is generally required. A dispositive problem with this theory, however, is that the purported clarification comes before the exception has been announced. We cannot believe that the drafters were so obtuse.

Moreover, there is a reason why the regulations distinguish between obligations to pay money and obligations to provide services or property. As the IRS explained when the final QSF regulations were promulgated, paragraph (f)(1) was added to maintain consistency with the general rules set forth in 26 U.S.C. (I.R.C.) § 461 regarding when an accrual-basis taxpayer can claim a deduction. *See* Settlement Funds, 57 Fed. Reg. 60,983, 60,985 (Dec. 23, 1992). Under § 461(h)(2)(B) a liability of the taxpayer to provide property or services is not incurred until "the taxpayer provides such property or services." (So, for example, a taxpayer that assumes in 1990 an obligation to remove a drilling

platform in 1998 does not "incur" the $200,000 removal cost until the actual removal in 1998, even if it prepaid most of the removal cost to a service company in 1990. *See* Treas. Reg. § 1.461-4(d)(7) Ex. 1.)

Example 1 in the regulation also illustrates that extinguishment is not generally required. "[E]xamples set forth in regulations remain persuasive authority so long as they do not conflict with the regulations themselves." *Cook v. Comm'r*, 269 F.3d 854, 858 (7th Cir. 2001). The example states:

> In a class action brought in a United States federal district court, the court holds that the defendant, Corporation X, violated certain securities laws and must pay damages in the amount of $150 million. Pursuant to an order of the court, Corporation X transfers $50 million in cash and transfers property with a fair market value of $75 million to a state law trust. The trust will liquidate the property and distribute the cash proceeds to the plaintiffs in the class action. The trust is a qualified settlement fund because it was established pursuant to the order of a federal district court to resolve or satisfy claims against Corporation X for securities law violations that have occurred.

Treas. Reg. § 1.468B-1(k). Significantly, the trust was a QSF despite the deposit of $25 million less than the court had awarded. Claimants seek to avoid the import of this example by arguing that because the assets in the example were transferred "[p]ursuant to an order of the court," the defendant "satisfied or discharged" the judgment and would have been insulated from actions to recover the remaining $25 million under Fed. R. Civ. P. 60(b)(5). They suggest that the

deficiency was attributable to a compromise in lieu of an appeal, or the corporation's lack of additional assets. Claimants' argument, however, is founded on pure speculation. Example 1 nowhere states that the court ordered the transfer of only $125 million, that the parties compromised, or that Corporation X lacked sufficient assets to satisfy the entire judgment. Nor can we see any reason for the example to speak of a $125 million payment, rather than the full $150 million, if the $125 million fully absolved the defendant of liability. We can only infer that the drafters created the $25 million deficiency specifically to illustrate that a fund can qualify as a QSF even if it does not completely extinguish a transferor's liability.

Reinforcing our conclusion further is a comparison of the QSF regulations with the earlier statute creating the entity known as a Designated Settlement Fund (DSF), an entity which we will have reason to discuss later in more detail. The statute provides that to be a DSF, a fund must both have "the principal purpose of resolving and satisfying . . . claims," I.R.C. § 468B(d)(2)(D), and "extinguish[] completely the taxpayer's tort liability with respect to [those] claims," *id.* § 468(d)(2)(A). If "extinguish completely" and "resolve and satisfy" were synonymous, there would have been no need to include both phrases in the DSF statute. And if "resolve and satisfy" does not necessarily mean "completely extinguish" in the DSF statute, it is logical to conclude that "resolve or satisfy," the

phrase used in the QSF regulations, also stands for something less than complete extinguishment.

In light of the services-or-property section, Example 1, and the DSF statute, we hold that the QSF regulations do not create a complete-extinguishment requirement. Thus, the Estate can still be a QSF even though the victims will not be completely compensated for their injuries and their claims may therefore survive.

### (ii) Liability for the Provision of Services or Property

As previously noted, "a liability for the provision of services or property" cannot be the predicate liability for a QSF "unless the transferor's obligation to provide services or property is extinguished by a transfer or transfers to the [purported QSF]." Treas. Reg. § 1.468B-1(f)(1). The Receiver contends that this provision "applies when the basis of liability underlying the claim arises from the sale of property or services." Rec. Br. at 34. Because the victims' claims arise out of the sale of securities and the provision of brokerage services, he reasons, they would therefore come within the provision.

We disagree. Paragraph (f)(1) does not speak of the source of the liability. Rather, it comes into play when the transferor has an "obligation to provide services or property." Perhaps there was at one time an obligation with respect to some of the victims to provide them with the securities they had paid for, but that is

not the obligation addressed by the Estate.  After the plan to return securities to Wellshire on behalf of the victims was terminated, the Estate was created to compensate the victims for their financial losses.  The obligations being satisfied (at least in part) by the Estate were the obligations to refund the purchase price of the securities.  The Estate's purpose was not to pay for services or property to be provided to the victims.  Therefore, paragraph (f)(1) is not applicable.

## b.  Predicate Liabilities

Appellees contend that the liabilities here do not "[a]ris[e] out of a tort, breach of contract, or violation of law," as required by Treas. Reg. § 1.468B-1(c)(2), and are in fact liabilities excluded by § 1.468B-1(g).

### (i)  "Arising out of a tort, breach of contract, or violation of law"

On the first point, Appellees appear to argue as follows:  (1) the claims here sound in restitution, since the sole purpose is to refund, to the extent possible, the victims' original investments; and (2) a cause of action for restitution does not arise "out of a tort, breach of contract, or violation of law."  We are not persuaded. We agree that the victims have a cause of action for restitution (often called "unjust enrichment").  But even if liability for unjust enrichment does not come within the language of the QSF regulations, an issue we need not address, the fact that the victims have such claims is unimportant because a claim for unjust enrichment can coexist with a claim sounding in tort, contract, or violation of law.  *See, e.g.,*

Restatement (Third) of Restitution and Unjust Enrichment § 13 cmt. a (Tentative Draft No. 1, 2001) ("In the case of a contractual transfer . . . , the consequences of fraudulent inducement may be simultaneously a part of contract law and of the law of restitution."). Here, the fraudulent transactions give rise not only to claims for unjust enrichment, but also to common-law claims in fraud and contract, as well as claims for securities fraud. And for each of these claims a potential remedy is refunding the amount of the original investment. *See* Dan B. Dobbs, Law of Remedies § 9.1 (2d ed. 1993) (fraud); *id.* § 12.1(1) (contract); *id.* § 9.2(1) (securities fraud). Thus, the victims' "claims . . . result from . . . event[s] . . . that ha[ve] given rise to . . . claim[s] asserting liability . . . [a]rising out of a tort, breach of contract, or violation of law." Treas. Reg. § 1.468B-1(c)(2).

### (ii) Excluded Liabilities

As for Appellees' claim that the QSF regulations explicitly exclude the liabilities here from being the predicate for treating the Estate as a QSF, they rely on the exclusions in Treas. Reg. § 1.468B-1(g)(2) & (g)(3).

Before addressing each exclusion, we reject the Receiver's suggestion that the United States waived its right to respond to these (and other) arguments when it did not discuss them in its opening brief. These arguments do not relate to the basis of the district court's ruling; they raise potential alternative grounds for affirming that ruling. When an appellee raises in its answer brief an alternative

ground for affirmance, the appellant is entitled to respond in its reply brief. *See Sadeghi v. INS*, 40 F.3d 1139, 1143 (10th Cir. 1994).

Section 1.468B-1(g)(2) excludes "obligation[s] to refund the purchase price of, or to repair or replace, products regularly sold in the ordinary course of the transferor's trade or business." In our view, this provision does not apply here because the word "products," as used in the provision, refers to tangible goods, not intangibles like investments in securities. This is one of the common usages of the word. *See, e.g.*, Restatement (Third) of Torts: Products Liability § 19(a) (1998) ("A product is tangible personal property distributed commercially for use or consumption."); 15 U.S.C. § 2301(1) (Magnuson-Moss Warranty Act) ("The term 'consumer product' means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ."). And this usage fits the context. Consider the three obligations referenced in the provision. Certainly, businesses do not "repair" intangibles, and an obligation to "replace" one is rare, if not nonexistent. To be sure, there are occasions, as in this case, when a business can incur an obligation to refund the purchase price of an intangible. But this provision was intended to prevent taxpayers from taking advantage of favorable tax treatment of QSF's when dealing with "certain regularly recurring liabilities," Settlement Funds, 57 Fed. Reg. 5399, 5401 (Feb. 14, 1992); and any enterprise that regularly incurs obligations to refund

the purchase price of intangibles (obligations that are most likely to result from fraud or a statutory violation) is better referred to as a "racket" than by the regulation's terms "trade" or "business."

If the intent were to include intangibles, we believe the drafters would have used language specifically conveying that meaning. We note that in the immediately preceding paragraph, the drafters used the word "property." *See* § 1.468B-1(f)(1) ("Liabilities to provide services or property."). Use of the word "product" in paragraph (g) suggests a narrower focus. The liabilities here do not arise out of the sale of tangible goods and are therefore not encompassed by this provision.

In their petition for rehearing en banc, Appellees argue that certificated securities are tangible. But the enterprises of Brown and Kuhlen were not in the business of selling stock *certificates*; they were selling investments. We are confident that § 1.468B-1(g)(2) does not apply to the circumstances of this case. *Cf. In re Oakley*, 344 F.3d 709 (7th Cir. 2003) (currency is not "tangible property" for purposes of Indiana's debtor exemptions).

Turning to § 1.468B-1(g)(3), it excludes "obligation[s] of the transferor to make payments to its general trade creditors or debtholders that relate[] to a title 11 or similar case." As the United States acknowledges, a receivership is a "similar case." *See* I.R.C. § 368(a)(3)(A)(ii). Nevertheless, the victims are neither general

trade creditors nor debtholders of any of the perpetrators of the fraud or their enterprises.

Addressing first the term "general trade creditors," the word "general," when used to modify "creditor," simply means "unsecured." *See* Black's Law Dictionary 375 (7th ed.1999). And the term "trade creditors" refers to those to whom a debt is owed for the provision of goods (or perhaps goods or services) used in the conduct of one's business. *See, e.g.*, David W. Pearce, The Dictionary of Modern Economics 430 (1981) ("Trade Credit" is "[c]redit extended by a trader or producer to his customers through terms of sale which allow payment at some time after the actual transfer of the goods"); 12 C.F.R. Pt. 202, Supp. I, ¶ 9(a)(3) (Federal Reserve Board official staff interpretation of Regulation B, relating to the Equal Credit Opportunity Act, states: "The term trade credit generally is limited to a financing arrangement that involves a buyer and a seller—such as a supplier who finances the sale of equipment, supplies, or inventory; . . . ."); R. J. Shock & Robert L. Shock, The Wall Street Dictionary 428 (1990) (Trade credit is "[a]n account that a supplier keeps for the company buying its goods or services"); *In re Stratford of Texas, Inc.*, 635 F.2d 365, 367 (5th Cir. 1981) ("their indebtedness was to trade creditors, i.e., suppliers of goods and services for these operations"). Thus, the victims are not "general trade creditors."

As for the term "debtholders," it does not refer to just any creditors owed a

debt, but only to those who hold a debt instrument. *See* Gretchen Morgenson & Campbell R. Harvey, The New York Times Dictionary of Money and Investing 74 (2002). The victims are not debtholders.

Our rejection of an overly expansive interpretation of the terms "general trade creditors" and "debtholders" is supported by the statement in the final regulations that liabilities are not excluded from the coverage of the QSF regulations just because they are associated with a title 11 or similar case:

> The final regulations exclude claims of general trade creditors and debtholders that relate to a title 11 or similar case, or to a workout. However, qualified settlement fund treatment remains available for other liabilities such as tort liabilities irrespective of whether the liability, for example, relates to a title 11 case.

Settlement Funds, 57 Fed. Reg. 60,983, 60,984 (Dec. 23, 1992). In sum, Appellees cannot find relief in § 1.468B-1(g)(3).

### 3. Other Arguments that the Fund is not a QSF

#### a. Absence of a Transferor

Appellees claim that the Estate is not a QSF because those who were the sources of the assets in the Estate are not "transferors" within the meaning of the regulations. "A 'transferor' is a person that transfers (or on behalf of whom an insurer or other person transfers) money or property to a qualified settlement fund to resolve or satisfy claims described in paragraph (c)(2) of this section against that person." Treas. Reg. § 1.468B-1(d)(1). The Receiver argues that a transferor must

own the assets that it deposits in the fund, and that such was not the case here because the assets transferred were actually owned by the investors. Claimants appear to argue additionally that a transferor must either (1) claim a deduction arising from the transfer or (2) be identified by the IRS as entitled to one, and that neither condition was satisfied here. As we proceed to explain, however, the requirements that Appellees would impose cannot be found in the QSF regulations, nor can they be inferred from the operation of the regulations.

### (i) Ownership

Under the regulations, assets transferred to a fund for the purpose of resolving or satisfying claims are "treated as owned by the transferor" until the fund meets all the requirements for QSF treatment. Treas. Reg. § 1.468B-1(j)(1). From this provision, the Receiver infers that a person who does not own the transferred assets is not a "transferor." We need not, however, determine whether those who transferred assets to the Estate were actual owners of any of the assets placed in the Estate because the Receiver's inference is incorrect.

The tax laws do not require a person to be a true owner in order to be treated as one. For example, embezzled funds are generally included as gross income, *see James v. United States*, 366 U.S. 213, 215, 222 (1961); *see also* Treas. Reg. § 1.61-14(a) ("Illegal gains constitute gross income."), despite the fact that the embezzler lacks title to the funds and his victims are entitled to restitution, *see James*, 366

U.S. at 216.  One cannot conclude that just because the transferor may be treated as the owner for tax purposes, the transferor must in fact be the actual owner.

### (ii)  Deductibility

Claimants assert that one of the purposes of the QSF regulations is to enable a taxpayer who transfers property to a QSF to take a tax deduction, and therefore a QSF cannot be established until the person entitled to a deduction has been identified.  This argument ignores, however, that there are situations in which no deduction is available.  A transferor who is an accrual-basis taxpayer may claim a deduction if (1) economic performance has occurred, *see* I.R.C. § 461(h)(2), and (2) the transferred funds are a deductible expense under another provision of the Tax Code, *see id.* § 161; Treas. Reg. § 1.446-1(c)(1)(ii)(A).  If the expense itself is not deductible, the transferor cannot claim a deduction even if, by transferring assets to the QSF, it has economically performed.  Moreover, the transferor may be a tax-exempt organization, which, of course, takes no deductions.  Thus, the creation of a QSF is not dependent on there being an identified taxpayer who can take a tax deduction for transfers to the QSF.  The IRS's alleged failure to identify a transferor entitled to claim a deduction does not prevent the Estate from meeting the QSF requirements.

### b.  The Proposed Regulation

For their final assault on the characterization of the Estate as a QSF,

Appellees rely on a proposed regulation. In February 1999 the IRS issued a notice that it was considering a regulation that would create a new entity, the Disputed Ownership Fund (DOF). *See* Escrow Funds and Other Similar Funds, 64 Fed. Reg. 4801, 4810 (proposed Feb. 1, 1999) (to be codified at 26 C.F.R. pt. 1). According to Claimants, the Estate satisfies the proposed requirements for a DOF. They would have us conclude that the apparent need for additional regulations implies that the QSF regulations do not cover entities described in the DOF regulation. This argument is defeated by the language of the proposed regulation. The proposed DOF regulation explicitly recognizes potential overlap with the QSF regulations by stating that a fund can be a DOF only if it is not a QSF. *Id.* The existence of the proposed regulation, therefore, does not in any way alter the method of determining whether a fund is a QSF.

### B.    Validity of the QSF Regulations

Appellees contend that even if the Estate satisfies all the requirements to be a QSF, it still should not be treated as one. They claim that (1) the statutory authorization for the QSF regulations was an unconstitutional delegation of authority, (2) the regulations violate the statutory authorization, and (3) application of the regulations in this case would violate a treaty with Germany. We reject each argument.

### 1.  Unconstitutional Delegation

-29-

Claimants argue that I.R.C. § 468B(g), the source of Treasury authority to issue the QSF regulations, is an unconstitutional delegation of legislative power. To understand the issue, we must examine the history of this provision.

Section 468B(g) is a 1988 amendment to the 1986 statute that created a new entity called the Designated Settlement Fund (DSF). I.R.C. § 468B. In essence, the statute provides that a fund is a DSF if (1) it has the principal purpose of resolving and satisfying claims against the taxpayer, (2) the claims arise out of personal injury, death, or property damage, (3) it is established pursuant to court order, (4) it is funded entirely by qualified payments, (5) it is administered by individuals unrelated to the taxpayer, (6) it completely extinguishes the liabilities involved, (7) its transferor has elected DSF treatment, and (8) neither its transferor nor related parties hold beneficial interests in the fund's income or corpus. I.R.C. § 468B(d)(2)(A)-(F). A DSF is subject to taxation at the maximum rate applicable to trusts, and the tax is directly imposed on the fund itself, not on its transferors or beneficiaries. *Id.* § 468B(b)(1). Under the DSF rules, a person "economically performs" by making a "qualified" payment to the DSF. *Id.* § 468B(a). Thus, the DSF's transferor can immediately claim a deduction for the amount contributed and does not need to wait until the funds are distributed to the beneficiaries.

Because DSF treatment is elective and the statute's requirements are relatively strict, many settlement funds do not qualify as DSFs. Congress addressed

taxation of these other settlement funds in 1988 when it added the challenged

subsection to the DSF statute. That subsection reads:

> Nothing in any provision of law shall be construed as
> providing that an escrow account, settlement fund, or
> similar fund is not subject to current income tax. The
> Secretary [of the Treasury] shall prescribe regulations
> providing for the taxation of any such account or fund
> whether as a grantor trust or otherwise.

*Id.* § 468B(g).

Under current Supreme Court doctrine, § 468B(g) does not delegate authority

unconstitutionally. The nondelegation doctrine provides "that Congress may not

constitutionally delegate its legislative power to another branch of Government."

*Touby v. United States*, 500 U.S. 160, 165 (1991). The doctrine derives from

Article I, § 1 of the Constitution, which states that "[a]ll legislative Powers herein

granted shall be vested in a Congress of the United States." The nondelegation

doctrine does not, however, prohibit all delegation of authority. Congress may

obtain the assistance of the other branches so long as it provides an "intelligible

principle" to guide the exercise of the delegated authority. *Mistretta v.

United States*, 488 U.S. 361, 372 (1989) (internal quotation marks deleted)

(upholding power of Sentencing Commission). The Supreme Court has not been

reluctant to find such a principle. *See id.* at 373-74 ("[W]e have upheld . . .

Congress' ability to delegate power . . . to determine excessive profits[,] . . . to fix

commodity prices that would be fair and equitable[,] . . . to determine just and

reasonable [utility] rates[,] . . . [and] to regulate public broadcast licensing 'as public interest, convenience, or necessity' require." (internal citations omitted)). Indeed, it is enough if Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *Id.* at 372-73 (internal quotation marks omitted). The Court has invalidated statutes under the nondelegation doctrine only twice, both times in 1935. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

We find no unconstitutional delegation here. In § 468B(g) Congress (1) expressed its general policy to permit taxation of settlement funds not then taxed under the DSF regulations, (2) expressly directed the Secretary of the Treasury to promulgate regulations, and (3) limited the exercise of the Secretary's authority to "escrow account[s], settlement fund[s], . . . [and] similar fund[s]." I.R.C. § 468B(g). Also, implicit in the delegation of authority was that the regulations would "fit" within the rest of the tax laws, so that similar cases would be treated similarly and opportunities for manipulation would be minimized. The delegation of authority in § 468B(g) was not out of line with other delegations upheld by the Supreme Court. Indeed, the Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531

U.S. 457, 474-75 (2001) (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

### 2. Misuse of Delegated Power

Both Appellees argue that the Secretary of the Treasury exceeded his authority under I.R.C. § 468B(g) because the QSF regulations issued under that authority rendered other parts of the original statute obsolete. They point out that under the statute, DSF status is elective, meaning that a fund otherwise meeting the DSF requirements is not a DSF unless the taxpayer elects DSF treatment. With the addition of the QSF regulations, however, a fund that has not elected DSF status but otherwise meets the DSF requirements is a QSF, and is taxed in exactly the same manner as a DSF.

This argument, however, ignores the scope of the authority granted: "The Secretary shall prescribe regulations providing for the taxation of any such account or fund whether as a grantor trust or otherwise." I.R.C. § 468B(g). The statute leaves it open to the Secretary of the Treasury to determine the proper taxation of settlement funds and the like. There is no proviso that taxation must be subject to an election by the potential taxpayer, any more than there is a proviso that some other DSF requirement be retained. The regulation did not provide for electivity because that would result in undesirable complexity and inconsistency of tax treatment of similar funds, claimants, and transferors. Settlement Funds, 57 Fed.

Reg. 60,983, 60,984 (Dec. 23, 1992). In our view, the QSF regulations are within the delegation of authority.

### 3. Treaty With Germany

Appellees argue that a treaty between the United States and Germany precludes taxation of the Estate because German investors are the Estate's beneficial owners and the treaty generally exempts German investors in United States securities from taxation on interest income and capital gains derived from those securities. The argument is flawed because our tax laws distinguish between taxable entities, like QSFs, and their beneficial owners.

In *Maximov v. United States*, 373 U.S. 49 (1963), the Supreme Court examined the taxation of an American trust whose only beneficiaries were British citizens exempt by treaty from United States taxation. *Id.* at 50, 52. The beneficiaries asked that the trust's gains be exempted from taxation because only the exempt beneficiaries would experience the economic burden of the tax and such a result would undermine the treaty's overriding purpose. *Id.* at 52. The Court found that the treaty exempted only United Kingdom "residents," and that the trust itself was not a United Kingdom "resident." *Id.* at 52-53. It declined to extend treaty rights to the trust, stating, "Mindful that it is a treaty we are construing, and giving the [treaty] all proper effect, we cannot, and do not, either read its language or conceive its purpose as encompassing, much less compelling, so significant a

deviation from normal word use or domestic tax concepts." *Id.* at 52.

Like the treaty at issue in *Maximov*, the treaty at issue here exempts foreign "residents" from certain United States taxes. *See* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, August 29, 1989, U.S.-F.R.G., S. Treaty Doc. No. 101-10 (1991) (the Treaty). "[A]ny entity that is treated as a body corporate for tax purposes" is a "person," *id.* at Art. 3, cl. 1(d)-(e), and therefore can be a "resident," *id.* at Art. 4, cl. 1. The Estate is a "person" because, as a QSF, it is treated as a corporation with respect to when and how it files its income tax returns. *See* Treas. Reg. § 1.468B-2(k). But the Estate is not a German "resident" because under the Treaty a person is a resident of a foreign state only when "under the laws of that State, [that person] is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature . . . ." Treaty, Art. 4, cl. 1. Neither Appellee has argued that under the laws of Germany the Estate owes tax "by reason of [its] domicile" or otherwise. Under the laws of the United States, however, a QSF is "a *United States* person and is subject to tax on its modified gross income." Treas. Reg. § 1.468B-2(a) (emphasis added). Thus, the Estate is a resident of the United States, not a resident of Germany. As such, the Estate is not entitled to relief from United States taxes under the Treaty. Accordingly, we reject Appellees'

argument that the Treaty exempts the Estate from taxation.

### C. Taxation as a Grantor Trust

The Receiver argues that the Estate is a liquidating grantor trust and should be taxed under the rules applicable to such an entity, not under the QSF regulations. The Estate may in fact be a liquidating grantor trust. *See* Treas. Reg. § 301.7701-4(d) ("An organization . . . [is] a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose."). Whether it is such an entity, however, is irrelevant because under the regulations a QSF that "could be classified as a trust within the meaning of [Treas. Reg.] § 301.7701-4 [the section classifying organizations as trusts for federal tax purposes] . . . [,] is classified as a qualified settlement fund for *all purposes* of the Internal Revenue Code." Treas. Reg. § 1.468B-1(b) (emphasis added).

### D. Offsetting

The Receiver's final argument is that even if the Estate qualifies as a QSF, it does not have taxable gain because the investors' losses of more than $40 million offset any gains that the Estate may have enjoyed. It is not clear that this issue was raised below. In any event, the argument fails because the Estate's gains or losses are not determined with reference to the beneficiaries' gains and losses. The

Estate's gain or loss with respect to a particular asset is the difference between the value of the asset when the Estate received it and the value of the asset when the Estate distributed or sold it. *See* Treas. Reg. § 1.468B-2(b),(e),(f). We therefore reject the Receiver's offsetting-loss theory.

## IV.  CONCLUSION

We **REVERSE** the district court's determination that the Estate is not a QSF. We **REMAND** for proceedings consistent with this opinion to determine the amount of income tax owed by the Estate as a QSF.